716 So.2d 831 (1998)
William Bryan KING, M.D., Appellant,
v.
Priscilla BYRD, individually and as Guardian, Friend and Natural Parent of Kenan A. Byrd, a minor, Appellee.
No. 97-1384.
District Court of Appeal of Florida, Fourth District.
August 26, 1998.
Clarification, Certification and Stay of Mandate Denied September 11, 1998.
*832 Mark Hicks and David J. Maher of Hicks & Anderson, P.A., Miami and David Spicer of Bobo Spicer Ciotoli Fulford, West Palm Beach, for appellant.
Edna L. Caruso of Caruso, Burlington, Bohn & Compiani, P.A., West Palm Beach and Willie E. Gary and Paul Mark Lucas of Gary, Williams, Parenti, Finney, Lewis, McManus, Watson & Sperando, Ft. Pierce, for appellee.

ON MOTION FOR REHEARING
WARNER, Judge.
We deny the appellant's motion for rehearing, grant appellee's motion, grant the motion for clarification and withdraw our previously issued opinion and substitute the following in its place.
After a heated trial in this medical malpractice case, the jury awarded appellee/Priscilla Byrd $7,633,000 as compensation for brain damage to her son which occurred during his birth. Appellant, Dr. William King, contends that the trial was flawed because the trial court: (1) refused to permit the exercise of a peremptory challenge as to one juror, (2) permitted counsel to attack defense counsel's ethics during the examination of two witnesses, (3) permitted improper closing argument, and (4) erred in the application of its ruling on the statute of limitations. We affirm on all issues.
In voir dire, the defense sought to exercise a peremptory challenge on the first juror, Tisha Williams. Upon initial questioning, Ms. Byrd's attorney asked for Ms. Williams's background, and she revealed that she worked for the sheriff's department, had twin five-year-old girls, and was single. Defense counsel's voir dire was very short. In fact, he individually questioned only Ms. Williams and one other juror. He prefaced *833 his questioning with a statement to the jury regarding the case and specifically questioned whether the jurors could lay aside sympathy for Ms. Byrd's six-year-old brain damaged son. As to Ms. Williams, he asked her whether, after having seen Ms. Byrd's little son, she could determine that Ms. Byrd was not entitled to any money if the evidence showed that the doctor didn't do anything wrong. Ms. Williams responded that she could do that. He asked her how she generally felt about medical malpractice, to which she replied that she had never dealt with anything like it. Finally, he asked her whether she could listen to complicated medical testimony in a week and one-half long case and render a verdict. Ms. Williams stated that she could.
During the jury selection process, defense counsel exercised a peremptory challenge as to Ms. Williams. Plaintiff's counsel objected, stating that Ms. Williams was a black woman who had said she could be fair. In response, defense counsel stated that:
I'm entitled to strike anybody, if I don't like the way they cut their hair. But this is a single mother, virtually the same age, with two young children. She's going to identify, whether she's black, white or anything else. She's a single mother with young children, that's the last person I would want on the jury, regardless of their color.
The court responded that:
Well, the computer picks these jurors and you've got to give me a better reason to excuse her than she's a single mother with two children.
MR. GARY (plaintiff's counsel): If I may, your Honor, she's the one that said, when he asked her, gave her the microphone, she was one of the few, could you walk out of here and find for the defendant against this lady. She said, yes, I could do it.
MR. SPICER (defense counsel): I don't believe it, Your Honor. And I've given you my reasons. If you took twenty lawyers and you didn't say what color she was, they would tell you they don't want a single mother with two young children on this jury. There would not be a defense attorney that would want this juror on their trial.
Defense counsel renewed his request to exercise a peremptory strike as to Ms. Williams at the end of jury selection, but the court again denied the motion.
Melbourne v. State, 679 So.2d 759, 764 (Fla.1996), clarified the process for challenging peremptory strikes of jurors on the grounds of racial bias:
A party objecting to the other side's use of a peremptory challenge on racial grounds must: a) make a timely objection on that basis, b) show that the venireperson is a member of a distinct racial group, and c) request that the court ask the striking party its reason for the strike. If these initial requirements are met (step 1), the court must ask the proponent of the strike to explain the reason for the strike.
At this point, the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step 2). If the explanation is facially race-neutral and the court believes that, given all the circumstances surrounding the strike, the explanation is not a pretext, the strike will be sustained (step 3). The court's focus in step 3 is not on the reasonableness of the explanation but rather its genuineness.
(footnotes omitted). The supreme court pointedly limited the review of appellate courts in such determinations on challenges to peremptory strikes:
Accordingly, reviewing courts should keep in mind two principles when enforcing the above guidelines. First, peremptories are presumed to be exercised in a nondiscriminatory manner. Second, the trial court's decision turns primarily on an assessment of credibility and will be affirmed on appeal unless clearly erroneous. The right to an impartial jury guaranteed by article I, section 16, is best safeguarded not by an arcane maze of reversible error traps, but by reason and common sense.
Id. at 764-65 (footnotes omitted)(emphasis added). Applying the principles of Melbourne to this case, we find that plaintiff's attorney adequately complied with step one *834 by objecting that Ms. Williams was an African-American woman. Without really waiting for the court to request an explanation, in accordance with step two, the defense offered that its reason for striking Ms. Williams was because she was a single mother with two small children who might identify with the plaintiff. That is a race-neutral reason for the challenge (even though it is not gender-neutral). See Smith v. State, 662 So.2d 1336, 1338 (Fla. 2d DCA 1995). The court responded by stating that the reason was insufficient to justify excusing her. We interpret this as a determination that the reason was not genuine and was a pretext, thereby fulfilling step three of the analysis.
Having reviewed the record, we cannot conclude that the decision was clearly erroneous. Defense counsel began his explanation of the reason for striking by stating that he could strike anyone even if he didn't like the cut of their hair. This may have evinced to the court a lack of credibility of any of the following explanations. In addition, the defense questioned Ms. Williams regarding her ability to put aside sympathy, to which she responded that she could. In questioning, the defense seemed more interested in Ms. Williams's ability to understand the trial proceedings than her sympathy for Ms. Byrd.
As appellate judges, we were not at the trial. We did not see the expressions, hear the tones of voices, or observe the general dynamics of the courtroom. That is why Melbourne left decisions with respect to peremptory challenges to the trial court. Because those decisions turn on credibility determinations which encompass the assessment of all the circumstances and dynamics of the trial setting, appellate review is very narrow indeed. We must respect that discretion. Since we cannot find that the decision is clearly erroneous, we affirm.
The next point raised is more troubling to us from the standpoint of attorney conduct. Appellant complains of attacks on defense counsel's ethics during the trial. Defense counsel opened the door to such attacks because of what we perceive to be highly questionable conduct at trial. Two of plaintiff's experts were former clients of defense counsel and he sought to impeach these experts with details regarding the cases in which he had represented them. When plaintiff's counsel objected, particularly with respect to the ethics of such an attack, defense counsel informed the court that he had been in contact with the Florida Bar and had received an opinion over the phone that this type of questioning was not unethical as long as privileged information was not brought up.[1] The court allowed general questions as to the first doctor.
Later, another medical expert for the plaintiff, a neuropsychologist, testified to the injuries sustained by Ms. Byrd's son. During cross-examination, defense counsel went into questions about his background, ability and competence:
Q. Doctor, is there anything about your background that Mr. Lucas did not talk about that reflects upon your credibility and your ability?
A. Maybe you need to refresh my memory.
Q. I'll be glad to do so if you can't think of anything.
Plaintiff's counsel objected, and during a bench conference, it became known that defense counsel had represented this doctor in a grievance proceeding filed by a patient. The doctor had been put on probation, was not allowed to see female patients without supervision, and was charged with incompetence. He was on probation at the time of the examination conducted on Ms. Byrd's son. At the bench conference, plaintiff's counsel objected to this line of questioning and maintained that it was conduct unbecoming of a lawyer. Defense counsel replied that the grievance was "public record," and that any lawyer in the state could use any public record. Plaintiff's counsel objected that the grievance was irrelevant and immaterial. Nevertheless, the court decided to let it in.
*835 Defense counsel then questioned the doctor extensively about the charges filed by the State Board of Psychological Examiners, alleging that he was incompetent and had committed an act constituting sexual battery on a patient. The doctor admitted that he was charged but stated that he was acquitted or put on probation. When pressed, he said "I was put on probation. They didn't find me guilty. There's no proof of it. Your firm represented me, you should know." Defense counsel persisted in going through the entire grievance, including the fact that, as part of his probation, the doctor had to put letters in female patients' files regarding the charges. The doctor protested that what was done was pursuant to defense counsel's firm's advice. The doctor questioned what this had to do with the diagnosis he offered in connection with this case, which is a question we also ask.
On redirect, plaintiff's counsel asked the doctor for the name of the law firm which had represented him in the grievance proceeding, to which the doctor replied, "I will be in contact with them today; Bobo Spicer." At that point, defense counsel objected and maintained that the doctor had no right to accuse him of anything since the Bar had said that the questioning was permissible. The court allowed plaintiff's counsel to ask a few additional questions to clarify that the doctor acted on the advice of his lawyers in the grievance proceeding. On recross, defense counsel showed the doctor a copy of the State of Florida file on his license and asked whether anything he questioned him on was not contained in this public document. To that, the doctor replied, "I don't know. I would have to sit here for an hour and read this public record. I think it's highly unethical you bring these things up to harm a child and discredit me." After a few more questions and similar answers, the questioning concluded. Despite this highly extraordinary cross-examination with matters involving the doctor's handling of female patients, the defense never put on any evidence of its own to impeach his opinions with respect to the condition of Ms. Byrd's son. That testimony went unchallenged.
We agree with the appellee that the court should never have allowed such cross-examination in the first place. It was entirely irrelevant as it was not a proper attack on the witness's credibility. See §§ 90.608.610, Fla. Stat. (1997); Farinas v. State, 569 So.2d 425, 429 (Fla.1990); Miles v. Allstate Ins. Co., 564 So.2d 583, 584 (Fla. 4th DCA 1990). But having let it in, defense counsel's cross-examination of the doctor on the incident opened the door to the doctor's claims of unethical conduct.[2] We ourselves have substantial concerns as to the ethics of defense counsel's attacks on his former client. See R.Regulating Fla.Bar 4-1.6, 4-1.9. While defense counsel claimed that anything in a public document can be revealed, even against a former client, the rule states that an attorney may not use information relating to the representation of a former client to the disadvantage of that client except as rule 4-1.6 would permit with respect to a client or "when the information has become generally known." R.Regulating Fla.Bar 4-1.9(b). We are not prepared to state that all information contained in any public document is "generally known" within the meaning of the rule. It seems to us highly questionable that an attorney could attack, embarrass, and malign a former client with matters on which he represented and counseled that client, where such matters have no relevance to the proceeding in which the client is a witness and are not proper impeachment. We are aware that on the criminal side of the bench, public defenders frequently withdraw from representation of a current client when a former client may be required to be impeached on matters involving the public defender's representation of that client. We do not think the standards of ethics on the civil side should be any less. However, it is not our responsibility to interpret the rule of professional conduct in this case. Suffice it to say that, given this extraordinary and uncalled for attack on a former client, defense counsel opened the door about as wide as he could to *836 the counter charge of ethical violations. We find no error.
Appellant also challenges comments by the plaintiff's attorney in closing argument. Since defense counsel made no objections, the issue is not preserved. See Murphy v. International Robotics Sys., Inc., 710 So.2d 587, 587-88 (Fla. 4th DCA 1998). Although some of counsel's remarks in closing argument were improper,[3] we do not deem the unobjected comments to rise to the level of fundamental error. Id.
Finally, we find no error in the trial court's order determining the date when Ms. Byrd became aware of the possibility of medical negligence. Based on Dr. King's own argument at the summary judgment hearing, the court determined that she did not have knowledge of any actual medical malpractice prior to 1992. While the appellant argues on appeal that the court erred because there was evidence that she could have discovered it at an earlier time, this was not the argument presented to the trial court and appears to us to be made for the first time on appeal.
For these reasons, we affirm the final judgment of the trial court.
GLICKSTEIN and SHAHOOD, JJ., concur.
NOTES
[1] We are unaware of any rule that allows admissibility of evidence to be determined by a telephone call to the Florida Bar.
[2] The charges of unethical behavior made in front of the jury were made by the doctor-witness, not the lawyers for the plaintiff.
[3] We specifically condemn counsel's use of the term "hired gun" to refer to a defense expert. See Budget Rent A Car v. Jana, 600 So.2d 466, 468 (Fla. 4th DCA 1992).